*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2011-338

APRIL TERM, 2012

| | |
|---|---|
| In re Grievance of Clint Glover | } APPEALED FROM: |
| | } |
| | } Labor Relations Board |
| | } |
| | } DOCKET NOS. 10-46, 10-54 & 11-15 |

In the above-entitled cause, the Clerk will enter:

Grievant works for the Vermont Department of Corrections (DOC). He appeals pro se from a Labor Relations Board decision that upheld his demotion, and another order issued the same day that upheld a three-day suspension.[1] We affirm.

### I.   Demotion

We begin with grievant's demotion claim. Grievant was demoted from a Correctional Facility Shift Supervisor to a Correctional Officer I in 2009 following a DOC investigation into the death of an inmate. In October 2010, grievant, who was then represented by counsel, filed a grievance with the Board asserting that the State violated the collective bargaining agreement (CBA) by demoting him. Specifically, grievant argued that: the demotion was in retaliation for his complaint and grievance activity; he was disciplined without just cause; and the employer improperly bypassed progressive discipline.

Following a hearing, the Board rejected these claims. It found as follows. Grievant has been a DOC employee since 1987 and he acted as a shift supervisor between 1997 and 2009. Grievant received extensive training in suicide prevention, including instruction on how to conduct physical checks of inmates who are under close observation. These special observation checks are supposed to occur at staggered intervals, not to exceed every fifteen minutes. Correctional officers are required to log the checks that they perform on a Special Observation Monitoring Sheet. These checks are a fundamental part of a correctional officer's duties.

In August 2008, M.H., an inmate suffering from alcohol withdrawal, was lodged at the prison. Because of his medical condition, M.H. was placed in a glassed-in observation cell, located a short distance from the Admissions Control (AC) desk. M.H. was held under close custody, which required special observation checks.

---

[1] Grievant's Notice of Appeal references a third matter decided by the Vermont Labor Relations Board on the same day, but his briefing does not address that one-day suspension upheld by the Board. Accordingly, we do not consider that matter.

Grievant was the lone shift supervisor on duty on August 17-18, 2009 between 10:00 p.m. and 6:00 a.m. Two correctional officers were also on duty, including P.B. Grievant knew that M.H. was suffering from alcohol withdrawal, that M.H. had become increasingly agitated, and that he had previously injured himself. He knew that M.H. could have a seizure as a result of his medical condition. At approximately 6:05 a.m. on August 18, M.H. was found lying on the floor of his cell. He was unresponsive and cold to the touch. He was transported to a hospital where he was pronounced dead at 6:53 a.m. DOC investigated the death, which included reviewing a video recording of the AC area during the relevant time period. The video showed that P.B., the correctional officer responsible for checking on M.H., did not conduct a majority of the required special observation checks. Instead, both P.B. and his fellow correctional officer spent most of their shift watching non-work-related material on the computer.

The videotape also showed grievant watching the computer screen along with the correctional officers for approximately forty-seven minutes, with a two minute interruption. Grievant knew that none of the special observation checks were done during this time. Grievant's office also had a window that looked out onto the AC desk. Grievant did not confront the officers about the hours they spent watching non-work-related material on the computer nor did he speak to P.B. about any missed observation checks. P.B. falsely indicated that he had completed the checks. Grievant stated that it was a "normal practice" for P.B. to use the DOC computer for non-work-related duties. Grievant indicated that he did not address this issue as long as it did not affect employees' performance or interfere with their job duties. Grievant asserted that this was standard practice within the prison.

The DOC subsequently sent grievant a letter describing the results of its investigation and informing him that it was considering serious disciplinary action against him. The DOC charged grievant with violating various DOC Work Rules and a State Personnel Policy by failing to ensure that P.B. conducted special observation checks of M.H., failing to ensure that the special observation sheets were checked for timeliness and accuracy, and failing to appropriately address staff misconduct. The DOC indicated that grievant was grossly neglectful, committed gross misconduct, and jeopardized the health or safety of the inmate by failing to perform his job as a shift supervisor. The DOC also charged grievant with bringing discredit on the DOC through his neglect of his supervisory duties. Additionally, it charged grievant with violating work rules and policies by engaging in excessive personal use of a work computer and allowing P.B. to do the same. The DOC found that grievant's conduct provided just cause for bypassing progressive discipline and dismissing him from his position. Following a Loudermill meeting with grievant and a union representative, grievant was informed that he would be demoted to a correctional officer position. The prison superintendent signed a document entitled "Twelve Factors," which contained an analysis supporting the demotion decision.

Based on these and other findings, the Board rejected grievant's assertion that the DOC violated various provisions of the CBA by demoting him. It first found that grievant presented no evidence that he was engaged in complaint or grievance activities as defined by the CBA that could have formed a basis for the DOC to retaliate against him. Grievant's claim was based on a 2007 incident in which the superintendent approached grievant and other prison employees to discuss whether they were interested in being on an audit team without compensation. Grievant declined the invitation. A number of other employees, including grievant, approached a union

steward to complain about this request. The steward spoke to the prison superintendent about the issue but did not inform him which employees had expressed concern about the proposal. There was no subsequent complaint or grievance filed by the union or prison employees on this issue. Given the lack of a complaint or grievance filed under the CBA, and absent evidence that the superintendent knew that grievant had spoken to the union steward on this issue, the Board found grievant's retaliation claim unsupported by the evidence.

The Board also rejected grievant's claim that he was disciplined without just cause and that the DOC improperly bypassed progressive discipline. The Board found that DOC met its burden of showing that disciplining grievant was reasonable and that grievant had fair notice that such conduct would be grounds for discipline. In reaching its conclusion, the Board recognized that grievant's past disciplinary record and work record operated in his favor. Nonetheless, it found that grievant's serious offenses reasonably caused his supervisors to lose confidence in his ability to perform at a satisfactory level as a supervisor. It explained that protecting the health and safety of offenders in DOC custody was a critical responsibility of correctional officers and supervisors. Given grievant's knowledge of M.H.'s medical condition and his interactions with M.H. on the evening in question, grievant should have been aware of the importance of performing observation checks on M.H. Instead of ensuring that P.B. properly performed these checks, however, grievant neglected his supervisory responsibilities. He also ignored P.B.'s disregard of policies on use of computers for non-work purposes and then joined P.B. in excessive personal use of the work computer while an inmate requiring frequent observation was left unattended.

The Board found that grievant failed to show that he was treated inconsistently with other supervisors committing similar offenses. He did not present evidence of any other supervisors who were treated more leniently than he for engaging in similar misconduct. In fact, there was no evidence of a supervisor engaging in similar misconduct. The Board found that grievant's offenses also adversely impacted the DOC's reputation. It explained that prisoner rights and advocacy groups had watched the video showing grievant's and P.B.'s misconduct. Their actions were embarrassing to the DOC and harmed its reputation. The Board did not find grievant a good candidate for rehabilitation as a supervisor given his ongoing failure to take responsibility for his misconduct. The Board reiterated that grievant had engaged in serious misconduct jeopardizing the life or health of an offender and had demonstrated gross neglect of his duties as a supervisor. It found that the DOC had reasonably concluded under the circumstances that alternative sanctions to demotion were not adequate or effective to deter such misconduct by grievant in the future. In sum, the Board concluded that just cause existed for the disciplinary demotion of grievant. The Board thus dismissed the grievance.

Grievant appeals from this order. He first raises a procedural claim, asserting that the DOC did not promptly respond to his Step II grievance or to the Step III hearing. He also argues that the DOC and the Board did not sufficiently review and address the timeliness issue.

The Board directly addressed this issue in its decision. It noted that grievant had asserted that decisions at the earlier steps of the grievance procedure were issued in an untimely manner. The Board explained that grievant had not cited any provision of the CBA that he alleged was violated by this action. Because Board rules required grievant to provide specific references to the pertinent section or sections of the CBA alleged to be violated, the Board declined to

3

consider this issue. See Vt. Labor Relations Bd. Rules of Practice § 18.3(D), available at http://vlrb.vermont.gov/rules_of_practice/part_1 (stating that a grievance filed with the Board must contain "[s]pecific references to the pertinent section or sections of the collective bargaining agreement, if applicable, or the pertinent rule(s) or regulation(s) which are alleged to be violated").

Given the plain language of the rule, the Board did not err in refusing to address this argument. See generally 3 V.S.A. § 926(a) ("Grievance hearings at the board level shall be conducted in accordance with the rules and regulations promulgated by the board."). As the State points out, this same requirement is also present in the CBA. See Agreements between the State of Vermont and Vermont State Employees' Association, Inc., Corrections Bargaining Unit (July 1, 2010-June 30, 2012, Article 15(2)(c) (a "grievance shall contain . . . [s]pecific references to the pertinent section(s) of the contract or of the rules and regulations alleged to have been violated"), available at http://humanresources.vermont.gov/services/labor/collective_bargaining_ agreements. Grievant failed to comply with this requirement.

Even we were to conclude that the Board should have addressed this claim, however, we would not find reversible error. The CBA provides specific requirements for pursuing claims of untimeliness at the Step II and Step III grievance stages, and grievant fails to show that he followed those steps here or that he presented any evidence on this point at the hearing before the Board. See id. Article 15(3)(c)(6), (7) (explaining that remedy for failure to issue a timely response to a Step II grievance is to allow grievant to file a Step III grievance, and failure to issue a timely decision at Step III level requires union to file written notice with the Vermont Department of Human Resources of such deficiency). Moreover, the Board also found that the processing of the Step II and III grievances was delayed in part by agreement of the parties.

Grievant offers no support for his remaining assertion that the State and the Board failed to adequately consider his timeliness argument. See In re S.B.L., 150 Vt. 294, 297 (1988) (appellant bears burden of demonstrating how the trial court erred warranting reversal, and Supreme Court will not comb the record searching for error); see also V.R.A.P. 28(a)(4) (appellant's brief should explain what the issues are, how they were preserved, and what appellant's contentions are on appeal, with citations to the authorities, statutes, and parts of the record relied on).

We thus turn to the merits of the Board's decision. We presume that the Board's decision is "correct and reasonable," In re Towle, 164 Vt. 145, 148 (1995), and we defer to the Board's decision in areas within its expertise, In re Merrill, 151 Vt. 270, 273 (1988). We will uphold the Board's findings unless clearly erroneous, and we will uphold the Board's order where supported by its findings. Id. at 273.

On appeal, grievant essentially challenges the Board's assessment of the weight of the evidence. He asserts, for example, that the DOC improperly bypassed progressive discipline and he points to evidence that he believes supports his position. Grievant also argues that he should not be punished for non-work-related computer use, as the DOC did not enforce rules prohibiting excessive personal use of computers, and impliedly allowed such conduct. He argues that there was no evidence to show that he was responsible for M.H.'s death. He also maintains that the Board should not have found the superintendent credible.

4

The Board considered and rejected the first two arguments. As set forth above, it concluded that the DOC did not improperly bypass progressive discipline and it identified numerous reasons for its conclusion. As to the appropriate sanction, the Board carefully considered the factors articulated in Grievance of Colleran and Britt, 6 VLRB 235 (1983). The Board concluded that grievant's misconduct was serious, that he violated his responsibility to properly supervise P.B. and act as a role model for subordinate officers, and that he had fair notice as an experienced and trained supervisor that his conduct was prohibited. The Board considered the fact that grievant had not been disciplined in the previous fifteen years, but concluded that this factor was outweighed by the serious nature of the misconduct, which reasonably led the DOC to lose confidence in his ability to act as a supervisor. It found that grievant failed to show that he had been treated inconsistently with other supervisors committing similar offenses, and that he was not a good candidate for rehabilitation as a supervisor due to his ongoing failure to take responsibility for his misconduct. The Board's findings are supported by sufficient evidence, and its conclusions are supported by its findings.

The Board also concluded that grievant should be disciplined for his excessive non-work-related computer use and for allowing P.B. to engage in excessive personal use of the computer as well. The Board recognized that the applicable policies allowed a limited degree of personal use of a work computer when it did not interfere with an employee's performance of his or her duties. The Board rejected grievant's assertion, however, that the standard acceptable practice at the prison went beyond this limited personal use. It also found that grievant was aware that he was responsible for enforcing and complying with the policies and procedures at issue. The fact that other individuals might have engaged in limited personal use of work computers does not undermine the Board's finding that grievant both observed P.B. engage in excessive personal use of the computer, accompanied by nonperformance of his duties, and that grievant himself did the same. While grievant disagrees with the Board's conclusions, he fails to show that any of the Board's findings are unsupported by record evidence or that its findings do not support its conclusions.

As to grievant's remaining claims, we note that the DOC did not demote grievant because he caused M.H.'s death, nor did the Board find grievant responsible for M.H.'s death. To the contrary, the Board emphasized that while grievant's misconduct was discovered as a result of M.H.'s death, it was not dependent on it. Finally, we reject grievant's assertion that the Board should have found the superintendent not credible. As we have often repeated, credibility assessments and the assessment of the weight of the evidence are matters reserved exclusively for the factfinder. See, e.g., Ohland v. Dubay, 133 Vt. 300, 302 (1975) ("The credibility of the witnesses and the weight to be given their testimony [is] primarily a question for the special expertise of the Board."). We will not reweigh the evidence on appeal. Rather, we are "bound by the principle that regardless of inconsistencies or even substantial evidence to the contrary, if credible evidence supports a finding, then it must stand." Id. The Board's decision is supported by its findings here, and its findings are supported by the evidence. We have considered all of grievant's arguments and we find no error in the Board's decision.

## II. Suspension

We turn next to grievant's appeal from the Board's dismissal of a February 2011 grievance. In this grievance, grievant argued in relevant part that the DOC violated the CBA by suspending him for three days. The Board rejected his claim, finding as follows. In January 2010, a new prison superintendent was hired. The superintendent became concerned about the lack of documented supervision of staff. He also identified a disturbing trend of default performance evaluation ratings of "excellent." A Performance Management Interview (PMI) is part of the performance review process. PMIs are discussions between a supervisor and a supervised employee about the employee's performance. They are designed to provide employees with feedback on their performance so that they can improve prior to their performance evaluations. The prison's post orders provide that supervisors will conduct PMIs at least once every sixty days, but this practice was not being followed. The new superintendent ordered supervisors to conduct PMIs with their staff.

In March 2010, grievant's shift supervisor conducted PMIs with the employees under his supervision. Grievant refused to participate. The supervisor discussed the issue with his superior who advised the supervisor to confront the behavior and meet with grievant. The supervisor was advised that insubordination on grievant's part could lead to a decision to relieve grievant from his shift and send him home. Several days later, the supervisor advised grievant that he must participate in a PMI. Grievant reiterated that he did not want to attend the meeting. The supervisor told grievant that he would send out an officer to cover for him during his shift to allow for the meeting, which he did. The supervisor also asked another individual to be present during the PMI because he thought it might be contentious.

When grievant walked into the supervisor's office, the supervisor asked him to close the door. Grievant kicked the chair that was holding the door open so that it struck the back of the metal desk where the supervisor was sitting, making a loud noise. Grievant refused to sit down as directed by the supervisor. He told the supervisor that he refused to talk with him. When the supervisor informed grievant that he did not have the option of refusing, grievant raised his voice, banged his coffee mug on the desk, leaned over the desk, and stated "I don't care, send me home." Grievant then walked out of the office. As he left, his supervisor informed him that if he refused to participate in the PMI, he would be sent home.

Grievant then returned to the supervisor's office and told the supervisor in a loud voice, "Just do your PMI." During the PMI, grievant stood with his arms crossed facing away from the supervisor and not looking at him. Grievant refused to answer the supervisor's questions. When the supervisor made a comment about grievant being rude to co-workers and to him, grievant responded in a loud voice and cursed at the supervisor. When the supervisor asked what he could do for grievant, grievant responded that he could "leave me the **** alone." Grievant's voice was raised in an angry manner during the meeting. At the conclusion of the PMI, grievant directed a derogatory remark toward the supervisor.

The supervisor reported the incident to his superior. In April 2010, the superintendent notified grievant that he had decided to suspend him for three days, without pay, for misconduct. The superintendent explained that grievant had violated a DOC work rule prohibiting employees from exhibiting behaviors that were physically or mentally abusive towards employees. He also

6

stated that grievant violated a work rule by comporting himself in a manner that brought discredit upon the DOC. He indicated that grievant's behavior had damaged the supervisor's confidence in grievant's ability to perform his duties.

Grievant argued before the Board that there was no just cause for the three-day suspension. The Board concluded otherwise. Considering grievant's actions in their entirety, the Board found that he had declined lawful orders of his supervisor, and that grievant had attended the PMI only under threat of being sent home. Grievant had also engaged in threatening, abusive, and disrespectful behavior during the meeting. He was threatening by kicking a chair and speaking in a loud, angry voice. He also inappropriately used profanity. This behavior violated DOC work rules.

The Board held that the proven charges justified a three-day suspension. It found grievant's offenses serious. It also noted that grievant's good performance record was outweighed by his recent disciplinary record, which included within the prior year a disciplinary demotion and a one-day suspension. The Board found that grievant had fair notice that his insubordinate and disrespectful actions were prohibited, and his offenses had an obvious adverse impact on supervisors' confidence that he would follow supervisory direction in performing assigned duties. The Board ultimately concluded that it was reasonable for the DOC to determine that alternative sanctions were inadequate to deter such conduct in the future. It reasoned that a lesser sanction would not have been sufficient to send a strong message to grievant that he should not engage in such insubordinate and disrespectful behavior in the future.

Grievant appeals from this decision. As before, he largely challenges the Board's assessment of the weight of the evidence. He asserts that the discipline imposed was arbitrary and capricious. He states that he used a curse word during the PMI for emphasis and not as an insult toward his supervisor. Grievant also claims that he did not violate any work rules and that his supervisor exaggerated what occurred. He suggests that his supervisor and the supervisor's superior had no authority to threaten that he would be sent home if he refused to attend the PMI meeting. He also argues that the DOC failed to prove that his participation in the PMI was mandatory.

The following work rules are at issue in this case. Work Rule #1 provides that "[n]o employee shall violate any provision of the collective bargaining agreement or/and State or Department work rule, policy, procedure, directive, local work rule or post order." Work Rule #6 states that "[n]o employee shall, while on duty . . . engage in verbal or physical behavior towards employees . . . which is malicious, demeaning, harassing or insulting." Finally, Work Rule #9 states that "[n]o employee, whether on or off duty, shall comport himself or herself in a manner that reflects discredit on the Department."

While grievant does not believe that he violated these rules, the Board concluded otherwise. As indicated above, the Board found that grievant violated Work Rule #1 by refusing to obey lawful and reasonable orders from his supervisor; he violated Work Rule #6 by engaging in verbal and physical behavior towards his supervisor that was demeaning and insulting; and he violated Work Rule #9 through his insubordinate and disrespectful behavior toward his supervisor. The Board identified reasonable grounds for its decision and its findings are supported by the evidence. Grievant's supervisor testified to grievant's behavior during the PMI.

7

He explained that grievant initially refused to participate in the PMI. When grievant did go to his supervisor's office, grievant violently kicked a chair that was holding the door open, he refused to sit down, he faced away from the supervisor, he leaned over the supervisor's desk and banged his coffee mug on the desk, telling the supervisor that he did not care what the supervisor did or said and that he wanted to be left alone. Grievant yelled and cursed at the supervisor during the meeting, and acted in an aggressive and disrespectful manner. He insulted the supervisor at the conclusion of the PMI. The Board found this testimony credible and it found that grievant's behavior warranted the sanction imposed.

We find grievant's challenges to the Board's decision unpersuasive. While grievant believes certain witnesses were biased against him or that they exaggerated their testimony, the Board did not agree. As previously discussed, it is for the Board, not this Court, to evaluate the credibility of witnesses of the weight of the evidence. We reject grievant's assertion that he had an "agreement" with his supervisor not to participate in the PMI, which the supervisor violated. The DOC's authority to send grievant home had he continued to refuse to participate in the PMI is not at issue in this case. Additionally, there is no requirement, as grievant suggests, that a violation of Work Rule #9 must occur in front of more than two witnesses. As to the requirement that PMIs be performed, the Board specifically found that post orders required these meetings to occur every sixty days. The superintendent directed shift supervisors to conduct such PMIs and grievant initially refused this order, and then complied only under threat. The Board did not err in concluding that grievant thereby violated Work Rule #1. Finally, grievant fails to show that he preserved any "double jeopardy" argument. See In re McMahon, 136 Vt. 512, 514 (1978) ("The grievant cannot present issues to this Court which were not previously placed before the Board for its consideration."). We have considered all of grievant's arguments and find no error in the Board's decision.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice